UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| SARAH JO KELLEY, as surviving daughter of Mariola Yates,<br><br>    Plaintiff,<br><br>v.<br><br>TOYOTA MOTOR CORPORATION,<br>Serve: 1 Toyota-Cho, Toyota City<br>    Aichi Prefecture 471-8571, Japan<br><br>TOYOTA MOTOR SALES U.S.A., INC.,<br>Serve: 120 S Central Ave., Suite 400<br>    Saint Louis, Missouri 63105<br><br>    Defendants. | Case No. _____<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

NOW COMES Plaintiff Sarah Jo Kelley, surviving daughter of Decedent Mariola Yates, by and through the undersigned attorneys, and for her Complaint against Defendant Toyota Motor Corporation and Defendant Toyota Motor Sales U.S.A., Inc., ("Toyota Defendants"), states and alleges as follows:

**PARTIES, JURISDICTION, AND VENUE**

1. Decedent Mariola Yates died on or about May 8, 2022, in Cape Girardeau County, Missouri.

2. This wrongful death action is brought by Sarah Jo Kelley, surviving daughter of Decedent Mariola Yates, pursuant to R.S.Mo. § 537.080

3. Plaintiff Sarah Jo Kelley is a citizen and resident of the State of Missouri.

1

4. Plaintiff Sarah Jo Kelley is a member of the statutory class of beneficiaries entitled to bring and recover damages for the wrongful death of her mother, Mariola Yates.

5. Defendant Toyota Motor Corporation (hereinafter "TMC") is a foreign corporation with its principal place of business in Japan. Defendant TMC is and was, at all relevant times, engaged in the design, testing, manufacture, distribution, and/or sale of various Toyota and Lexus vehicle models, including the Subject 2015 Toyota Highlander (VIN 5TDYKRFH2FS092281) involved in the incident giving rise to Plaintiff's Complaint ("Subject Vehicle"). Defendant TMC may be served with process via applicable international treaty at the above listed address.

6. Defendant Toyota Motor Sales U.S.A., Inc. (hereinafter "TMS") is a California corporation with its principal place of business in Plano, Texas. Defendant TMS is a subsidiary company of Defendant TMC. Defendant TMS is and was, at all relevant times, engaged in the design, testing, manufacture, distribution, and/or sale of Toyota and Lexus vehicle models, including the Subject Vehicle. Defendant TMS may be served with process via its registered agent 120 S Central Ave., Suite 400 Saint Louis, Missouri 63105.

7. At all times relevant to this Petition, Toyota Defendants served a market for Toyota and Lexus vehicles in the State of Missouri, and that product caused injury in the State of Missouri to a Missouri resident. As such, in accordance with the Supreme Court's ruling in *Ford Motor Co. v. Montana Eighth Judicial District Court et al.*, this Court has personal jurisdiction over Toyota Defendants.

8. Toyota Defendants are subject to the jurisdiction of this Court, in that they are companies conducting substantial business within the State of Missouri by maintaining continuous and systematic contacts with the State of Missouri, *including, but not limited to*,

    a. The Subject Vehicle was registered, serviced, and garaged in the State of Missouri;

    b. The Subject Vehicle fatally injured a Missouri resident in the State of Missouri;

    c. Toyota Defendants are global auto companies that market, sell, and service their products across the United States, including the sale of new and used Toyota and Lexus vehicles in the State of Missouri;

    d. Toyota Defendants encourage a resale market for their products, including the purchase and sale of used Toyota and Lexus vehicles in the State of Missouri;

    e. Toyota Defendants maintain a significant number of Toyota and Lexus dealerships throughout the State of Missouri, through which Toyota Defendants urge the citizens of the State of Missouri to purchase their vehicles, including the Subject Vehicle;

    f. Toyota Defendants enhance their brands and increase sales through the use of wide-ranging promotional activities, including television, print, online and direct-mail advertisements in the State of Missouri;

    g. Toyota Defendants ensure that customers keep their Toyota and Lexus vehicles long past the date of sale through the use of original parts and repair facilities across the country, including in the State of Missouri; and,

    h. Toyota Defendants transport new and used Toyota and Lexus vehicles on Missouri highways and railways for distribution throughout the State of Missouri and the United States.

    9. Toyota Defendants' business contacts with the State of Missouri are so continuous and systematic as to render them essentially at home in Missouri, and as such, this Court may exercise jurisdiction over Toyota Defendants. Toyota Defendants have purposely availed themselves of the privilege of conducting business in the State of Missouri and have thereby

3

consented to the jurisdiction of this Court. Toyota Defendants' conduct and connect with the State of Missouri are such that they could reasonably anticipate being hauled into a court in the State of Missouri.

10. Pursuant to 28 U.S.C. § 1332, this Court has subject-matter jurisdiction over this civil action, as the amount in controversy exceeds $75,000 and complete diversity of citizenship exists between the parties.

11. Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b) in that a substantial part of the events giving rise to this claim occurred within this judicial district.

## ALLEGATIONS APPLICABLE TO ALL COUNTS

12. In the late 1990's, Toyota Defendants began designing a keyless ignition system now known as the Smart Key System.

13. Toyota Defendants first implemented the Smart Key System in Japan in 2001.

14. Toyota Defendants first implemented the Smart Key System in the United States in 2004.

15. The Toyota Defendants, designed, manufactured, tested, certified, marketed, distributed, and/or sold the Subject Vehicle.

16. At the time it was designed, manufactured, tested, certified, marketed, and sold, the Subject Vehicle was equipped with Toyota's Smart Key System, an electronic keyless ignition system.

17. Toyota's Smart Key System is a vehicle entry and ignition system that uses a computerized keyless device that allows drivers to lock and unlock the doors or start and stop the vehicle engine without the use of a traditional key. The system operates by using two-way electronic communication between a remote unit and a special antenna located in the vehicle. With

4

this system, a traditional key does not need to be physically inserted into the ignition cylinder to start or stop the engine.

18. Toyota's Smart Key System is designed so that a "key fob" can remain in the driver's pocket or handbag when starting and stopping the vehicle's engine. When the key fob is within a specified range of the vehicle, signals are received by the antenna located within the vehicle. The signals being received by the antenna permit certain systems to activate in the vehicle, such as the engine start/stop function. While in range, the keyless starter button will become functional allowing the driver to push the start/stop button to turn on or off the vehicle's engine. There is no key to insert in an ignition key cylinder, no key to turn, and no key to remove to turn off the engine.

19. New technology, such as Toyota's Smart Key System, requires a change to basic and deep-rooted consumer behavior. For instance, consumers using the electronic key system no longer have to turn the key and remove it from the ignition to turn the vehicle off. This leads to foreseeable errors, such as inadvertently leaving the vehicle running after exiting the automobile.

20. In addition, this keyless ignition technology permits an operator to inadvertently remove the key fob while the vehicle is still running.

21. Prior to the Subject Incident, the National Highway Transportation Safety Administration received multiple complaints from consumers that have exited their cars with the key fob on their person and mistakenly left the vehicle's engine running.

22. Toyota's Smart Key System technology is a convenience feature, yet it creates certain safety risks that did not exist with the traditional key technology, including the risk of carbon monoxide gas being omitted from the vehicle while the driver, along with the key, are no longer in the vehicle. Due to these foreseeable risks, the Toyota Defendants were required to act

5

in a reasonable and prudent manner for consumers, including Decedent Mariola Yates, to either lessen the risk or see that sufficient precautions were taken to protect consumers.

23. Toyota Defendants did not undertake any human factors testing or analysis in the implementation and continued use of the Smart Key System, despite recognizing that a change from a traditional key to the Smart Key System poses added risks.

24. When Toyota Defendants adopted this keyless ignition design in the 2004 Prius, Toyota Defendants marketed this standard feature as a premium amenity. Toyota Defendants followed by equipping the 2005 Lexus vehicles with the feature, as well as the limited edition 2005 Avalon. Toyota Defendants described keyless ignition in greater detail in Lexus marketing literature as a convenience:

> The SmartAccess feature available for the LS 430 allows the driver to unlock the car simply by touching the door handle (with remote control in pocket or purse) and then start it at the touch of a button. The SmartAccess key fob, carried in the driver's pocket, transmits a radio signal to onboard antennas, authorizing the security system to unlock the car and permit engine starting. By simply carrying the SmartAccess key fob in a pocket or purse, the driver does not need to fumble for the car keys in the dark or inclement weather, and can enter the car easily even with hands full.

25. Toyota Defendants' marketing does not explain the nuances of the invisible key to consumers. It gives consumers the impression that the fob is the key, by branding it the "smart key system.".

26. Toyota Defendants have known, since at least 2001, that it is possible for a driver to leave the vehicle with the key while the engine is running in an enclosed space, posing a carbon monoxide poisoning risk to anyone exposed to the engine exhaust.

27. A decade prior to the production of the Subject Vehicle, Toyota Defendants recognized the very hazard that led to the death of Mariola Yates. The 2005 Toyota Avalon owner's manual included the following:

6

> When using the smart key system, it is possible to start or stop the engine as long as the key is on your person. For this reason, it is possible that a passenger may remove the key from the vehicle without the driver being aware of the fact. In such a case, it is not possible to restart the engine after having turned it off. ***In addition, it is possible that one may get out of the vehicle without being aware that the ignition switch has not been turned off completely***. When driving or getting in or out of the vehicle, drivers should make sure that they are carrying the key.

28. However, this statement was not included in the manual for the Subject Vehicle.

29. The first known death resulting from carbon monoxide poisoning with a keyless ignition vehicle was a Toyota vehicle.

30. The majority of deaths resulting from carbon monoxide with keyless ignition vehicles have been Toyota vehicles.

31. In April 2006, Jeanette and David Colter were killed by carbon monoxide poisoning when their Toyota Avalon was mistakenly left running in their garage.

32. In February 2009, in the State of New York, Ernie Cordelia and Mary Rivera unintentionally left their 2008 Lexus ES350 equipped with Toyota's Smart Key System in their garage. The running engine distributed carbon monoxide throughout the home, killing Ernie Cordelia and causing serious and irreversible brain damage to Mary Rivera, a college professor.

33. In February 2010, Manish Patel and one of her children suffered injuries from carbon monoxide poisoning when their 2007 Lexus ES350 equipped with Toyota's Smart Key System was unintentionally left running overnight.

34. On August 25, 2010, Chasity Glisson was killed, and her boyfriend Timothy Maddock was critically injured when Mr. Maddock's 2006 Lexus IS250 equipped with Toyota's Smart Key System was unintentionally left running in the garage.

35. On December 13, 2010, Michael Yaffee was killed when his 2009 Lexus EX350 was unintentionally left running due to its keyless ignition system.

7

36. In June 2012, Gerald Zitser was killed sitting in his living room recliner watching television when his 2006 Toyota Avalon equipped with Toyota's Smart Key System was unintentionally left running in his home's garage.

37. On June 9, 2013, Greenville, South Carolina couple Bill and Eugenia Thomason were asphyxiated when their 2007 Toyota Avalon was inadvertently left running due to its keyless ignition system.

38. In March 2015, Michael Quinn's family was critically injured as a result of carbon monoxide poisoning when his father's Lexus ES350 equipped with Toyota's Smart Key System was unintentionally left running in the garage, requiring emergent and critical medical care for his mother, father, and son.

39. On August 6, 2015, Mona Sternbach died when her Lexus RX350 was inadvertently left running due to its keyless ignition system.

40. On August 2, 2017, Fred Schaub of Spring Hill, Florida, was asphyxiated because his 2015 Toyota RAV4 was inadvertently left running in his attached garage, due to its keyless ignition system.

41. To date, there are at least 34 known deaths and 46 known injuries occurring from 47 incidents of carbon monoxide poisoning with keyless ignition vehicles.

42. Of these injuries and deaths, 13 deaths and 22 injuries resulted from Toyota and Lexus vehicles.

43. At least 37 Toyota owners have reported complaints to NHTSA via the Vehicle Owner's Questionnaire database expressing concern about design failures or describing incidents in which they inadvertently left their vehicle running or did not lock the transmission in Park resulting in a rollaway or a carbon monoxide incident; 36 of these complaints were lodged prior

to the Subject Incident. The majority of the complaints (25) noted the carbon monoxide danger posed by accidentally leaving the engine running when the vehicle is parked in a garage.

44. In January 2014, the National Highway Traffic Safety Administration's Office of Vehicle Compliance sent information requests to Toyota Defendants and other major automakers regarding 2012 and 2013 model year vehicles, based on evaluations of how their keyless ignition systems operated under different scenarios. NHTSA's Compliance Office found that the Toyota vehicles failed to deactivate after the driver exited with the fob.

45. The Subject Vehicle was not equipped with an automatic shut-off safety feature, though that safety feature was economically and technologically feasible when the Subject Vehicle was designed and manufactured.

46. For at least a decade before the Subject Vehicle was released into the marketplace, Toyota and other manufacturers designed remote start systems with an automatic engine shut-off feature. In fact, Toyota touted this capability in a remote starter brochure: "[a]ny vehicle started with the Remote Engine Starter can idle for a total of 20 minutes. Automatic engine shutdown occurs after 10 minutes, but the vehicle may be remotely started as many times as the user wishes and run for an additional 10 minutes. After 20 minutes of total operation, however, the vehicle must be started manually to reset the Remote Engine Starter."

47. NHTSA took note of the automatic engine shutdown feature in its 2011 NPRM: "[w]e are aware that some manufacturers already provide this feature on their passenger motor vehicles. Such manufacturers have determined on their own the appropriate range of time (15 minutes to half an hour or longer) after which the vehicle propulsion system is automatically shut off."

48. In 2012, major automakers General Motors and Ford Motor Company implemented automatic engine shutdown features in a number of their keyless ignition vehicles, irrespective of remote starters. For example, Ford added the automatic engine shut-off design to the 2013 Ford Fusion Titanium and Titanium Hybrid and the Lincoln MKZ. General Motors, according to service descriptions, implemented an engine shutdown feature in the 2013 Buick LaCrosse, Verano, and Regal, the Chevy Cruze, and Malibu and the Cadillac ATS, SRX, and XTS.

49. Though this safety feature, which is designed in part to prevent the tragedy that befell decedent, was feasible to implement in the Subject Vehicle, Toyota Defendants neglected to include it in the design of the Subject Vehicle.

50. On the evening before she died, Decedent Mariola Yates returned to her home in Cape Girardeau, Missouri.

51. Decedent Mariola Yates parked the Subject Vehicle in the attached garage of her residence.

52. Before exiting the Subject Vehicle with the key fob on her person, Decedent Mariola Yates inadvertently and unknowingly left the engine running. Her "key fob" for the Subject Vehicle was later found in her home.

53. Toyota Defendants designed the Subject Vehicle's engine to be virtually soundless and smooth and, as a result, Decedent Mariola Yates could not hear the idling engine as she exited the Subject Vehicle and entered her home with the key fob.

54. Decedent Mariola Yates was unaware that the Subject Vehicle was idling in the garage attached to the home and that deadly carbon monoxide gas was seeping into the home, poisoning her to death.

55.     On May 8, 2022, as a result of a wellness check, police found Decedent Mariola Yates in her bed. She asphyxiated due to the carbon monoxide. Her dog was also found dead near her body.

56.     Police checked the garage and discovered that the Subject Vehicle had run out of gas, but the engine was still warm to the touch.

57.     First responders tested the home and discovered fatal levels of carbon monoxide inside the home.

58.     As the result of carbon monoxide poisoning from the Subject Vehicle caused by the defects in the "keyless ignition" system described above, Decedent Mariola Yates was wrongfully killed. Plaintiff suffered the injuries and damages complained of in this suit.

## COUNT I – TOYOTA DEFENDANTS – STRICT LIABILITY

59.     Plaintiff hereby incorporates by reference the allegations set forth in the foregoing paragraphs as if more fully set forth herein.

60.     At all times relevant hereto, Toyota Defendants were actively engaged in the business of designing, manufacturing, marketing, warranting, distributing, and selling Toyota Highlander vehicles.

61.     Prior to the Subject Incident, Toyota Defendants designed, manufactured, assembled, inspected, tested, distributed, placed into the stream of commerce, and sold the Subject Vehicle in the normal course of their business for use by the general public.

62.     At the time the Subject Vehicle left the control of Toyota Defendants, it was defective and unreasonably dangerous when put to reasonably anticipated use.

63.     The Subject Vehicle was defective and unreasonably dangerous in multiple respects, *including, but not limited to*, the following:

11

   a. The ignition system on the Subject Vehicle permitted the key to be removed from the vehicle while the engine was running, allowing the vehicle to continue to run for an indefinite period of time without shutting off;

   b. The Subject Vehicle lacked an automatic shut-off or shut-down system in the event a consumer inadvertently leaves the vehicle running with the key outside of the vehicle;

   c. The Subject Vehicle lacked an adequate audible and/or visual warning to the user that he or she has left the vehicle running;

   d. The Subject Vehicle was designed to run as quietly as possible, thereby increasing the risk of users inadvertently leaving the vehicle running after exiting with the key;

   e. Toyota Defendants failed to provide reasonable and adequate warnings to users of the Subject Vehicle as to the dangerous propensity of the ignition system, including risks of carbon monoxide poisoning should the Subject Vehicle be left inadvertently running due to the keyless ignition system; and,

   f. In other respects, unknown to plaintiff at this time but which may become known prior to trial.

64. The Subject Vehicle was further in a defective and unreasonably dangerous condition in that it failed to give Decedent Mariola Yates fair and adequate notice of the danger and possible consequences of using the Subject Vehicle in the intended and appropriate manner.

65. The Subject Vehicle was expected to reach, and did reach, the hands of Decedent Mariola Yates without substantial change or modification.

66. The Subject Vehicle was used in a manner that could be reasonably anticipated.

67. Toyota Defendants knew or should have known that the Subject Vehicle would be used without inspection for defect and represented that the Subject Vehicle could be safely used for the ordinary purposes for which it was purchased.

68. The Subject Vehicle was in a defective and unreasonably dangerous condition at the time that it was sold to Decedent Mariola Yates, in that the Subject Vehicle was dangerous to

an extent beyond that which is contemplated by an ordinary and reasonable buyer or consumer, including Decedent Mariola Yates.

69. Toyota Defendants knew or should have known that the Subject Vehicle was defectively designed or manufactured in the particulars set forth above.

70. Toyota Defendants knew or should have known that technologically and commercially feasible safer alternative designs and methods of design, manufacture and warning existed and would have eliminated the unreasonably dangerous characteristics and condition of the Subject Vehicle.

71. Despite this knowledge, Toyota Defendants failed to design and manufacture the Subject Vehicle so as to eliminate said defects and unreasonably dangerous characteristics and propensities.

72. Additionally, despite this knowledge, Toyota Defendants failed to adequately warn consumers, including Decedent Mariola Yates, of the unreasonably dangerous condition of the Subject Vehicle prior to the Subject Incident.

73. As a direct and proximate result of the defective and unreasonably dangerous condition of the Subject Vehicle, Decedent Mariola Yates sustained fatal injuries.

74. Pursuant to R.S.Mo. §537.090, Plaintiff is entitled to recover for the following damages: pecuniary losses suffered by reason of the decedent's death; funeral expenses; the reasonable value of services, consortium, companionship, comfort, instruction, guidance, counsel, training, and support; and for the damages that Decedent suffered between the time of injury and the time she died, for which Decedent would have maintained an action had she survived.

75. Toyota Defendants distributed and sold the Subject Vehicle to the public in a defective condition with conscious disregard for the potential risks to consumers, thereby

demonstrating willful, wanton, and malicious conduct and showing a complete indifference to or conscious disregard for the safety of others. Due to the nature of Toyota Defendants' actions, Plaintiffs are entitled to punitive damages in an amount that will serve to punish Toyota Defendants and to deter like conduct.

**WHEREFORE**, Plaintiff respectfully requests this Court to enter judgment against Toyota Defendants for a reasonable sum of money as will fairly and reasonably compensate Plaintiff for her injuries and damages; for Plaintiff's costs herein expended and incurred; for prejudgment interest; for post-judgment interest; for punitive damages; and for such other and further relief as the Court deems just and proper under the circumstances.

### COUNT II –TOYOTA DEFENDANTS – NEGLIGENCE

76. Plaintiff hereby incorporates by reference the allegations set forth above in the foregoing paragraphs as though more fully set forth herein.

77. At all times relevant hereto, Toyota Defendants were actively engaged in the business of designing, manufacturing, marketing, warranting, distributing and selling Toyota and Lexus vehicle, including the Subject Vehicle.

78. Prior to the Subject Collision, Toyota Defendants designed, manufactured, assembled, inspected, tested, distributed, placed into the stream of commerce and sold the Subject Vehicle in the normal course of business, for use by the general public as ultimate consumers.

79. As a motor vehicle designer, manufacturer, distributor and seller, Toyota Defendants knew that users of their vehicles could be involved in motor vehicle collisions, and the extent of their injuries would frequently be determined by the design and construction of their vehicles, including the Subject Vehicle in this case.

80. Toyota Defendants had a duty to the general public, including Decedent Mariola

Yates and Plaintiff, to exercise reasonable care to design, manufacture, assemble, inspect, test, market, distribute, place into the stream of commerce and sell reasonably safe vehicles so as not to subject consumers to an unreasonable risk of harm.

81. Toyota Defendants breached their duty to exercise reasonable care in the design, testing, instructions/warnings, manufacture, and sale of the Subject Vehicle in multiple respects, *including, but not limited to,* the following:

a. Designing an ignition system that permitted the key to be removed from the Subject Vehicle while the engine was running, allowing the vehicle to continue to run for an indefinite period of time without shutting off;

b. Failing to provide reasonable and adequate warnings to users of the Subject Vehicle as to the vehicle's dangerous propensity, including risks of carbon monoxide poisoning should the vehicle be left inadvertently running due to the keyless ignition system;

c. Failing to install an automatic shut-off or shut-down system in the event a consumer inadvertently leaves the Subject Vehicle running with the key outside of the vehicle, which would shut the vehicle down after the vehicle was unoccupied, idle, or inert for a specific interval of time;

d. Failing to consider that the dramatic change to ingrained behavior, such as turning and removing a key to shut the vehicle down, could result in consumers inadvertently leaving the Subject Vehicle running;

e. Failing to recognize, understand, analyze, or test how the removal of an important fail-safe, i.e. the physical key, affects users inadvertently leaving the Subject Vehicle engine running;

f. Failing to implement a fail-safe for the Subject Vehicle ignition when removing an important fail-safe, i.e. the physical key;

g. Failing to provide adequate audible and/or visual warnings to warn the user that he or she has left the Subject Vehicle running;

h. Designing a Subject Vehicle to run as quietly as possible, thereby increasing the risk of users inadvertently leaving the vehicle running;

i. Failing to update the Subject Vehicle to include an automatic shut-off or shut-down;

15

j. Failing to use the level of care and skill which a reasonably prudent designer, manufacturer, seller, distributor, and/or supplier would use under like circumstances; and,

k. In other respects, unknown to Plaintiff at this time but which may become known prior to trial.

41. As a direct and proximate result of Toyota Defendants' negligent acts and/or omissions, Decedent Mariola Yates sustained fatal injuries.

42. Pursuant to R.S.Mo. §537.090, Plaintiff is entitled to recover for the following damages: pecuniary losses suffered by reason of the decedent's death; funeral expenses; the reasonable value of services, consortium, companionship, comfort, instruction, guidance, counsel, training, and support; and for the damages that Decedent suffered between the time of injury and the time she died, for which Decedent would have maintained an action had she survived.

43. Toyota Defendants distributed and sold the Subject Vehicle to the public in a defective condition with conscious disregard for the potential risks to consumers, thereby demonstrating willful, wanton, and malicious conduct and showing a complete indifference to or conscious disregard for the safety of others. Due to the nature of Toyota Defendants' actions, Plaintiffs are entitled to punitive damages in an amount that will serve to punish Toyota Defendants and to deter like conduct.

**WHEREFORE**, Plaintiff respectfully requests this Court to enter judgment against Toyota Defendants for a reasonable sum of money as will fairly and reasonably compensate Plaintiff for her injuries and damages; for Plaintiff's costs herein expended and incurred; for prejudgment interest; for post-judgment interest; for punitive damages; and for such other and further relief as the Court deems just and proper under the circumstances.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all allegations, claims and causes of action asserted herein.

Respectfully submitted,

/s/ J. Kent Emison
J. Kent Emison, MO# 29721
Michael J. Serra, MO # #63237
Justin R. Watkins, MO #60151
Langdon & Emison LLC
911 Main Street
P.O. Box 220
Lexington, MO 64067
Phone: (660) 259-6175
Fax: (660) 259- 4175
kent@lelaw.com
mserra@lelaw.com
justin@lelaw.com

and

J. Michael Ponder, MO# 38066
Cook Barkett Ponder & Wolz
1610 N. Kingshighway, Suite 201
P.O. Box 1180
Cape Girardeau, MO 63702
Phone: (573) 335-6651
Fax: (573) 335-6182
mponder@cbpw-law.com